## PLANTERS AND PEOPLES MUTUAL FIRE ASSOCIATION OF GEORGIA *v.* DeLOACH.

1. When a bill of exceptions properly certified purports to set forth evidence material to the consideration of the errors complained of, the assignments of error therein contained will be determined solely with reference to the evidence therein set forth, unless additional evidence incorporated in a brief thereof and made a part of the record is duly brought up in the manner provided by law. The foregoing is true notwithstanding that in a cross-bill of exceptions in the case there is an averment in effect that certain material evidence has been omitted from the main bill of exceptions, and the alleged omitted evidence is set forth in the cross-bill of exceptions.

2. A writing in the form of a policy of fire-insurance will not constitute a valid contract of insurance when it is not, at the time the contract therein purports to go into effect, executed by one authorized to execute contracts in behalf of the alleged insurer.

3. The mere acceptance by the person described in such a writing as the insurer of a sum of money as an assessment or premium will neither have the effect of rendering valid the unexecuted writing, nor of estopping the alleged insurer from making the defense that the writing was not executed by any one authorized to act in its behalf, when it appears that the assessment or premium was accepted in ignorance of the fact that the writing was not executed by one authorized at the time of its delivery to act in behalf of the insurer, and that upon the discovery of this fact the insurer promptly repudiated the act of the person who had delivered the writing and returned to the person claiming to be insured all of the money which the insurer or its authorized agent had received from him.

4. Although the rules of an association provide that litigation shall be conducted for the association by the president, together with a majority of the directors,

one who is the plaintiff in an action against the association which is defended by a duly licensed attorney at law will not be allowed to raise the question as to whether the defense is conducted by the officer required by the rules, otherwise than by calling in question the rights of the attorney at law to appear in behalf of the association. The presumption is that the attorney at law has the authority of the proper officers of the association to appear, and this presumption can be overcome only in the manner provided in Civil Code, § 4423.

Argued June 8, — Decided July 18, 1901.

Action on insurance policy. Before Judge Evans. Tattnall superior court. October 3, 1900.

Sarah E. DeLoach sued the Planters and Peoples Mutual Fire Association of Georgia, upon a policy of fire-insurance. The case was tried by the judge without a jury, and he gave judgment for the plaintiff for $168.75 principal, and costs. The defendant assigns error upon this judgment, because it is contrary to law and evidence; because the plaintiff had no valid policy of insurance, the policy sued on not having been issued and delivered by the defendant or any authorized agent; and because no contract of insurance was shown to have been entered into between the parties. The defendant also assigns error upon the refusal of the court to grant a nonsuit, on the ground that the plaintiff had made no case; and upon the admission in evidence of the policy sued on, over objection on the grounds, (1) that its execution had not been proved; (2) that its delivery had not been shown; (3) that if it had not been delivered and become a binding contract, no ratification of it by the association could be made except in writing. The plaintiff filed a cross-bill of exceptions to the following rulings: (1) The refusal to dismiss the defendant's plea, as it showed upon its face that it was being conducted by the president alone, now ex-president, and without the aid or help of any director of the association. The plea in the record is followed by an affidavit by "H. C. Smith, president association," that the facts set forth in the foregoing plea are true. (2) The refusal to allow H. C. Smith, the ex-president of the association, to answer questions asked him relative to his right and authority to make the defense, when in fact plaintiff is informed and believes that Smith would have answered that he had no authority to make this defense except upon his own motion.

The policy sued on recites that the defendant association, of the subordinate division of Tattnall county, in consideration of the receipt of $5.25, insures the property of the plaintiff for $800 on her

dwelling-house, $75 on her kitchen, and $25 on her tenant-house, against loss by fire, from March 25, 1895, during the corporate existence of the association, except as hereinafter provided, and upon the following among other conditions: All liabilities accruing to members of the association shall be paid by pro rata assessment of all the property assigned to the association; and its members shall be composed of the owners of property assigned to it. It shall be liable for only three fourths of the value of property lost or damaged. The general State agent shall be elected or appointed by the original incorporators of the State association, and county or local agents shall be appointed by such general agent. The officers of each county association shall be an agent, president, treasurer, and one director for each militia district. It shall be the duty of the president to sign all policies, order all assessments through the treasurer, pay all losses after they have been adjusted by a director or as many directors of the association as he may direct, and collected. When litigation is unavoidable, then he, together with a majority of the directors, shall conduct the suit for the association. Among other duties of the agent, he shall present all policies to the president for signature, keep a record of all meetings of the officers and all business of the association, and perform the duties of president if the president be unable to do so. Each director shall adjust all losses in their respective militia districts. Each member shall have one vote for each $1,000 of insurance, and each director shall have a vote for each $1,000 of insurance in his militia district. The president, treasurer, and directors shall be elected by a majority of the members in convention, for one year or until their successors be elected. Should either president or agent appoint assistants, "such assistants shall be responsible to their appointees, and not to the association, which shall hold each responsible for everything done in his name." Any member may withdraw his property from the association on paying all assessments and giving thirty days notice of his intention so to do; and the association may remove any property on giving like notice to the member affected. The agent shall furnish a full list of members, and the insured property in each militia district, to the directors of that district. Each member is obligated to pay his or her proportion of all losses and expenses accruing to this corporation; and all property insured by it, together with the title of the insured to the land on which such

property stands, shall be pledged to the corporation, during the continuance of their insurance, as to all debts or liabilities contracted or incurred by the corporation. The insured waives all homestead exemptions.

The plaintiff testified: J. A. Mattox brought me this policy. On October 5, 1897, my dwelling and kitchen covered by this policy were totally destroyed by fire. Mattox had been stopping with me. He would frequently come to my house, take meals, and spend the night. He told me he would just let the premium go for his board. That is the way in which I paid the premium. I paid no money. I paid but one assessment, $2.40, in May, 1897. I thought it was their business to notify me when they wanted assessments; and the only notice I got was the one for which I paid. After I was burned out I demanded payment of my policy from the association. They held a meeting in November, 1897. I told them that if I was not a member I wanted my money back. They gave me back the $2.40 which I had paid as an assessment. I took it and went up-stairs to consult my attorney; then returned and gave this money back to them. Some one in the meeting made some motion to take my money back.

J. A. Mattox testified: I was a subagent under Easterling, the agent of the association. He appointed me to solicit members. I was to get up names and report to him. I got up a list of members including the plaintiff, and handed them to him. He declined to accept the plaintiff as a member, and told me to pay back her premium and tell her the association would not accept her. I did not tell her this. I delivered her the policy without the knowledge of the officers of the association. C. W. Smith was not then the president. The policy was one of a number which he had signed up when he was president, but had not been used. Very soon after the issuing of this policy it was delivered to the association. When plaintiff agreed to become a member I handed her this policy. I did not go to her and take it up after the agent declined to accept her. She did not pay the premium, and I did not board it out with her. All the first premium on a policy went to the agent. I sent to the secretary of the association, on February 19, 1897, a list of names of members, including the plaintiff. I delivered other policies signed by C. W. Smith as president, after he went out of office; and I never heard of any kick. I do not know that any of the officials of the association knew of it.

W. H. Yeomans testified: I was secretary of this association in February, 1897, when Mattox sent me a list of names as members,. including the plaintiff. I entered them as such. I had no author-- ity for so doing, except that Mattox sent me the list. The asso- ciation took no action in this matter. I knew none of the circum- stances of the delivery of this policy to the plaintiff. Five or six losses occurred after this delivery and the time of her loss, but· only one of them was between the time she was enrolled as·a mem- ber and the time of her loss. For this one only she was assessed,. and paid the assessment. We did not then know of the facts con- nected with the delivery of the policy to her. But one meeting of· the association was held after I enrolled her name as a member, up· to the time of her loss. At the meeting in November, 1897, the: association ordered me to pay back to her the money she had paid on the assessment of May, 1897, and I did so then and there. She: went out, and after a while came back and threw the money on the· table where I was sitting. Some one moved that she be not prej- udiced by having received this money, if she was a member of the· association and had sustained loss; and that a committee be ap- pointed to investigate her status and report to the association. This. committee was appointed, and, after investigation, reported that she was not a member.

Other witnesses gave testimony similar to what has just been stated, and to the following effect: Easterling, the agent of the as-- sociation, had to approve applications for membership before any one could become a member. One half of the premium on every policy goes to the agent, and the other half to the association. When C. W. Smith was president he signed up a number of pol-- icies in blank, as a matter of convenience to himself. Some of· these were afterwards used, but in every case the president in office would erase the name of Smith and sign his own. No agent had any authority to deliver any of these policies signed by Smith after· his term of office had expired. The plaintiff's dwelling and kitchen could be rebuilt for $150 and $75, respectively. The association never treated her as a member, and as soon as it discovered that· she had paid an assessment it ordered the same to be refunded to· her. It did nothing before her loss to notify her that she was not· a member. It had one meeting after she paid the assessment and. before the one in November, 1897.

*James K. Hines* and *E. J. Giles,* for the fire association.
*Burkhalter & Morgan,* contra.

COBB, J. 1. The main bill of exceptions purported to set forth the evidence introduced at the trial, and the certificate of the judge was in the usual form, stating that the bill of exceptions " is true, and contains all the evidence . . material to a clear understanding of the errors complained of." The cross-bill of exceptions contains the following averment: " The defendant in error alleges that the plaintiff in error has omitted facts and rulings by the court in said case material to a clear understanding of the errors complained of; and hence the defendant in error has hereto attached what occurred in the trial of the said case, omitted by plaintiff in error, material to a clear understanding of the said case, and incorporates in this her cross-bill of exceptions all evidence material and the rulings of the court material that were omitted in the direct bill of exceptions, and prays that the Supreme Court may pass on the omitted evidence and the omitted rulings of the court in this her cross-bill of exceptions in conjunction with the direct bill of exceptions." The cross-bill contains evidence which does not appear in the main bill, and some of it seems to be in conflict with what is stated in the main bill. The cross-bill is certified by the judge in the usual form, the language of the certificate, so far as it is material to the present discussion, being exactly that quoted above from the certificate to the main bill. It is not the office of a cross-bill of exceptions to add to or change in any way the main bill of exceptions. The cross-bill of exceptions is a remedy provided for the successful party in the trial court to have reviewed rulings made against him during the trial, in the event his adversary is successful in obtaining a judgment in the Supreme Court which in its effect leaves the case to be tried again in the trial court. See Civil Code, § 5527. The cross-bill of exceptions must contain, or specify, so much of the evidence as is material to a clear understanding of the errors *therein* complained of. Other evidence than what is necessary for this purpose has no proper place in the cross-bill of exceptions, and if contained therein must be entirely disregarded. It was the right, even if it was not the duty, of the judge to have refused to sign the cross-bill of exceptions until all of this matter, entirely unnecessary and utterly irrelevant so far as anything in the cross-bill is concerned, had been stricken therefrom. See *Little* v. *Sparks,*

112 *Ga.* 220.    So much of the evidence contained in the cross-bill of exceptions as is material to the errors complained of therein will be considered in passing upon the questions therein made; no other evidence therein will be considered for any purpose whatever, and certainly it will not be considered in any way so far as the errors complained of in the main bill are concerned.    When there is no brief of evidence filed and made a part of the record, so that it may be brought to this court by a proper specification in the bill of exceptions, and the evidence is brought to this court in the bill of exceptions, the errors complained of must be determined in the light of the evidence contained in the bill of exceptions in which the assignment of error is contained.    The question may be asked, if a judge certifies a main bill of exceptions which does not correctly set forth the evidence, what is the remedy?    If there is no brief of evidence duly approved and filed, so that it can be transmitted to this court as record, we know of no remedy.    See *Tumlin* v. *Bass Co.*, 93 *Ga.* 594.    It has been held that, after a bill of exceptions has been duly certified, it is not within the power of the judge to alter or change the same in any way by an additional certificate. *Dyson* v. *Railway Co.*, 113 *Ga.* 327.    The principle of this ruling is applicable to any additional certificate, even though it be the usual certificate required to be affixed to a cross-bill of exceptions.

2. The official report which precedes this opinion contains a correct summary of the evidence as it is contained in the main bill of exceptions.    From this evidence no other conclusion can be possibly reached than that the paper relied on by the plaintiff as containing the contract of insurance between her and the defendant was not signed by any authorized officer or agent of the association at the time or subsequent to her application for membership in the association, and not only that she was never admitted as a member of the association by the constituted authorities, but that her application was expressly declined.    A contract of fire-insurance is not valid unless in writing.    Civil Code, § 2089.    The writing relied on to make the contract of insurance not having been signed by any one authorized by the association to execute contracts in its behalf at the time that it is claimed that the contract was entered into, the court erred in not excluding the paper from evidence.

3. It is claimed, however, that the unauthorized act of the agent in delivering the policy has been ratified by the association.    If

the contract had been duly executed, and the officers of the association had, after a full knowledge of all the facts, treated the plaintiff as a member, such conduct on the part of those authorized to act in behalf of the association might have had the effect of rendering the contract valid. But such is not the case. In the first place, there was no contract in writing at the beginning, and nothing but a writing will ever make a valid contract of fire-insurance. In the second place, all that was done by the officers of the association which could be at all construed as treating the plaintiff as a member of the association was, according to the uncontradicted evidence, done in ignorance of the facts in relation to her claim of membership, and as soon as the truth was known the association promptly repudiated the acts of those who had, without authority, been assuming to act in its behalf, and restored to the plaintiff every cent which it or any of its authorized agents had received from her. There was nothing whatever in the evidence to authorize a finding that the defendant was estopped from making the defense that it was not bound because the contract of insurance was not evidenced by a writing executed by one authorized to act in its behalf.

4. The policy provides that whenever litigation is unavoidable, the president, together with a majority of the directors, shall conduct the suit for the association. The defendant's answer in the present case was signed by "Enoch J. Giles, Defendant's Attorney," and was sworn to by "H. C. Smith, President Association." The plaintiff moved to dismiss the answer, "because it showed upon its face that the defense was being conducted by the president alone, now ex-president, and without the aid or help of any director of the said association." The motion was overruled. H. C. Smith was sworn as a witness, and testified that he was no longer president of the association. Plaintiff then sought to have him answer whether he was receiving any assistance from the directors, or was conducting the defense alone, and whether he had any authority to make the defense in the case. The court refused to allow these questions. This ruling and the one just referred to are made the subject-matter of exception in the cross-bill of exceptions. We see no error in these rulings. As a general rule the president of a mutual insurance company can defend a suit brought against it. 4 Joyce, Ins. § 3657. Whether this rule would apply to a person who

was president when the answer was filed but resigned before the case came on for trial, or whether the language above referred to in the policy sued on in the present case makes it imperative that the president should be assisted by a majority of the directors, are questions which we do not deem it necessary to decide. The answer was signed by a person as attorney at law for the defendant. The name of this attorney is also signed to the bill of exceptions filed by the defendant, and he acknowleged service of the cross-bill of exceptions filed by the plaintiff. It is, therefore, fair to assume that he conducted the trial for the defendant. No question was made as to the attorney's authority, and no motion was made to require him to produce his authority. The presumption of law is that he was duly authorized to represent the defendant in the case. Civil Code, § 4423. It was therefore, so long as the right of the attorney at law to appear for the defendant stood unimpeached, entirely immaterial whether the president or directors appeared at all or offered the attorney any assistance, and the fact that he may have been aided in the trial by a person not connected with the association can afford the plaintiff no cause for complaint.

*Judgment on main bill of exceptions reversed; on cross-bill affirmed. All the Justices concurring.*